IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Gwendolyn Nelson, | ) | C/A No. 1:09-1972-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael Astrue, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits. The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be remanded for further administrative action.

I.     Relevant Background

A.     Procedural History

Born June 21, 1961, Plaintiff was 45 years old as of July 20, 2006, her alleged onset date. Plaintiff filed her application for DIB and SSI on September 27, 2006. The

application was denied initially and upon reconsideration. Plaintiff testified at a December 8, 2008 hearing, which was held by Administrative Law Judge Frederick W. Christian ("the ALJ"). Tr. at 17–52. Plaintiff's counsel, Stephen Calcutt, was present at the hearing. *Id.* On February 10, 2009, the ALJ issued a decision denying Plaintiff's application for benefits, (Tr. at 10–16), which the Appeals Council upheld. Tr. at 1–4. Plaintiff filed this appeal, requesting reversal of the Commissioner's denial and a remand for an award of benefits or, in the alternative, remand for additional administrative proceedings.

B.   Plaintiff's Background and Medical History

1.   Background

Plaintiff is a high school graduate who has past relevant work ("PRW") as a machine operator and a certified nursing assistant. Tr. at 140, 136. She stopped working as a certified nursing assistant on her alleged onset date of July 20, 2006 to have surgery for her then-recently diagnosed breast cancer. Tr. at 135. She alleges disability based on her breast cancer, including the treatment for her breast cancer; lymphedema and neuropathy in her left arm and shoulder; and high blood pressure, insomnia, cardiomegaly, chronic pain, obesity, lymphedema, right shoulder pain, cervical surgery in July 2008, right knee surgery, depression, anxiety, and neck pain. Tr. at 135, 153, 156, 167. She was 47 years old as of the ALJ's December 2008 hearing and February 2009 decision. Tr. at 22.

2. Medical History

After a lump was discovered in Plaintiff's left breast, she underwent testing and surgery to obtain a biopsy of the mass. The pathology report indicated that there were two malignant masses identified as invasive ductal carcinoma, Grade III. Tr. at 227. Plaintiff consulted with general surgeon Dr. Henry Moses and, on July 20, 2006, Dr. Moses excised the mass by performing a lumpectomy/quadrectomy with advancement flap mastoplasty. Tr. at 235–36. During this procedure, Dr. Moses also performed a sentinel node biopsy to determine whether the cancer had spread to the adjacent lymph nodes in the axilla. Tr. at 235–36. Although that test indicated the cancer had not spread to the two nodes tested, Dr. Moses was concerned about the "more palpable firm nodes in the axilla that suggested diffuse metastatic involvement" and performed the more extensive axillary node dissection on Plaintiff during the July 20, 2006 surgery to remove any possible lymph node metastasis. Tr. at 235–36.

After the surgery, Dr. Moses restricted Plaintiff to "no heavy lifting or any strenuous activities." Tr. at 362. Notes from follow-up appointments with Dr. Moses indicate that Plaintiff's surgical sites were healing well and that she was having no problems related to the surgery. Tr. at 189–90.

Dr. Moses referred Plaintiff to oncologist Dr. Billy Clowney for treatment. Dr. Clowney met with Plaintiff on August 14, 2006 to discuss her breast cancer treatment. He explained to Plaintiff that she would need "adjuvant chemotherapy with AC every 14 days followed by XRT [radiation treatment]." Tr. at 298. He discussed the potential

side-effects, risks, and benefits of chemotherapy with her and also explained she would benefit from Herceptin therapy. Tr. at 298. He scheduled several tests, including a bone scan. Tr. at 298. Dr. Clowney ordered a radionuclide bone scan for August 18, 2006, which indicated some possible degenerative changes to her left knee, but revealed "no definite pattern of metastatic disease[.]" Tr. at 290.

Plaintiff began chemotherapy on August 22, 2006. Tr. at 292. After having received two cycles of chemotherapy, Plaintiff told Dr. Clowney on September 12, 2006 that she was having headaches and sinus congestion, but that she was tolerating the chemotherapy well. Tr. at 186–88. At that visit, she indicated she had not been experiencing any musculoskeletal pain or sensation of numbness or tingling ("paresthesias"). Tr. at 186–87. Dr. Clowney's examination did not reveal any swollen lymph nodes ("lymphadenopathy") or tenderness. Tr. at 187.

On October 10, 2006, after four rounds of chemotherapy, Dr. Clowney noted Plaintiff had chemo-induced anemia and was about to begin radiation therapy. Tr. at 183–85. He also noted she had no new complaints. Tr. at 183–85. Dr. Clowney's records of Plaintiff's October 23, 2006 examination indicate she continued to experience anemia, as well as photophobia secondary to chemotherapy and dehydration. Tr. at 180–82. Otherwise, Dr. Clowney noted Plaintiff's examinations remained unchanged in October 2006. Tr. at 180–85.

Plaintiff saw radiation oncologist Dr. Edward W. Duffy, Jr. on October 10, 2006. He discussed the potential side-effects of radiation with Plaintiff and found her to be an

appropriate candidate for post-operative radiation. Tr. at 194–95. She began radiation therapy on November 1, 2006 and completed it on December 18, 2006. Tr. at 209. A November 6, 2006 progress note by radiation oncologist Dr. Terence N. Moore indicated Plaintiff had conjunctivitis secondary to her chemotherapy, but unrelated to radiation treatments. Tr. at 208. Dr. Moore indicated Plaintiff was tolerating the radiation treatment well. Tr. at 208. In his November 27, 2006 progress note, Dr. Duffy indicated that Plaintiff complained of a rash on her upper back, but he noted the rash was unrelated to her radiation treatment and that the skin in the area being treated was "unremarkable." Tr. at 206. In his December 11, 2006 progress note, Dr. Duffy noted that Plaintiff "continue[d] to have some complaints of left upper extremity discomfort," which he indicated was "likely related" to her prior sentinel node dissection surgery. Tr. at 204. He noted that she had no other complaints. Tr. at 204. In his notes from the date of Plaintiff's last treatment, December 18, 2006, Dr. Duffy indicated Plaintiff had hyperpigmentation in the treated area, but that she had no other difficulties. Tr. at 209. In a letter dated December 18, 2006, Dr. Duffy informed Dr. Clowney that Plaintiff had completed her radiation treatment with no difficulties other than expected hyperpigmentation. Tr. at 211. Dr. Duffy noted that Plaintiff remained under Dr. Clowney's care and treatment with Herceptin was planned. Tr. at 211.

Plaintiff visited Dr. Clowney on December 18, 2006 with complaints of "numbness, burning, and tingling in her left arm." Tr. at 214. Dr. Clowney assessed this as "left arm pain," and indicated it was "secondary to radiation changes and nerve

damage," and that it "likely [would] improve over time." Tr. at 216.  He gave her samples of a medication for the condition.  Tr. at 216.  His examination revealed no motor or sensory deficits.  Tr. at 216.  He noted that Plaintiff complained of photophobia secondary to chemotherapy, but that she no longer had anemia or dehydration.  Tr. at 216. He also advised Plaintiff that her Herceptin treatment would begin after the holidays.  Tr. at 216.

As referenced by an agency medical consultant, Dr. Clowney indicated on January 2, 2007 that he had been treating Plaintiff "since August 2006" and that her treatment regime would require that she continue to be out of work for an additional 12 months. Tr. at 268.  Dr. Clowney further indicated that Plaintiff was "temporarily disabled" at the time.  Tr. at 268.  The consulting examiner indicated that Plaintiff had stage II breast cancer and had stopped work on July 20, 2006, but projected Plaintiff's breast cancer would be "non-severe" as of July 19, 2007.  Tr. at 268.  The same statement by Dr. Clowney appears elsewhere in the record labeled as a Treating Source Statement with a notation that the statement was obtained on January 30, 2007.  Tr. at 63.

Plaintiff began a 52-week course of Herceptin treatment in January 2007, and in February 2007, she resumed her chemotherapy treatment with Taxol.  Tr. at 318–20; 335. During her February 12, 2007 visit to Dr. Clowney, she complained of paresthesias in her left arm. Tr. at 320. Dr. Clowney assessed the left arm neuropathy as being related to the Taxol chemotherapy, planned to decrease the Taxol dosage for future treatments, and instructed Plaintiff to continue to take Metanx for the neuropathy.  Tr. at 318.

During her April 10, 2007 visit to Dr. Clowney, Plaintiff again reported left arm neuropathy as well as swelling in her left arm. Tr. at 331. Dr. Clowney instructed her to continue taking Metanx for the neuropathy and advised her to wrap the swollen arm in a warm, moist cloth. Tr. at 330–31. She continued to have the complaint of neuropathy in May and July 2007, and Dr. Clowney prescribed Lyrica in addition to Metanx. Tr. at 334, 336–37. During this time, Dr. Clowney's examinations of Plaintiff did not reveal tenderness, sensory deficits, or motor deficits. Tr. at 331, 333–34, 336–37.

On July 24, 2007, Plaintiff reported having leg pain from arthritis. Tr. at 338. On August 21, 2007, she reported that the lymphedema in her left arm was worse and that she had neuropathy in her feet. Tr. at 340. Dr. Clowney's office referred her to physical therapy for the lymphedema and continued her on Metanx for the neuropathy. Tr. at 340–41.

Dr. Clowney's notes from Plaintiff's September 25, 2007 and October 2, 2007 visits indicated her neuropathy was "[i]mproving with Metanx" and that she continued to receive physical therapy for her lymphedema. Tr. at 342–45. In November and December 2007, Plaintiff continued to report having lymphedema. Tr. at 346–49. In the December 18, 2007 treatment notes, Dr. Clowney's office indicated Plaintiff was taking Celebrex and Vicodin for pain and inflamation related to the lymphedema. Tr. at 349. Plaintiff completed her year of Herceptin treatment in January 2008. Tr. at 350.

The January 2, 2008 report from the Occupational Therapy Lymphedema Program at McLeod Regional Medical Center indicated that Plaintiff received treatment for the

lymphedema that was secondary to the axillary node dissection. The therapist reported that Plaintiff had not reported a decrease in the severity of her pain. Plaintiff informed the therapist that her pain was "20 plus some" on a scale of one to ten. Tr. at 321–22. The therapist found that Plaintiff's range of motion in her left shoulder was limited to 75% because of pain and that she had reduced strength, rated as 2 out of 5, in her left shoulder. Tr. at 321. Plaintiff had full strength in her right arm and intact sensation bilaterally. Tr. at 321.

Dr. Clowney noted on February 20, 2008 that Plaintiff had pain and a limited range of motion in the left arm, which was treated with Vicodin and Celebrex. Tr. at 350–52. In April 2008, Dr. Clowney continued to treat Plaintiff's left arm pain with Vicodin and Celebrex. Tr. at 354–58.

On May 6, 2008, Plaintiff went to Colonial Family Practice with complaints of right knee pain and stiffness, as well as right shoulder pain and paresthesias. Tr. at 324. She was diagnosed with right knee osteoarthritis, for which she received Vicodin, and right shoulder impingement, for which she received a steroid injection. Tr. at 324. One week later, her right knee pain had resolved, but her shoulder pain continued. Tr. at 325. On May 26, 2008, she returned to Colonial Family Practice with continuing shoulder pain, which she characterized as being severe and "1 million" on a scale of one to ten (with ten being the worst possible pain). Tr. at 326.

On June 20, 2008, Plaintiff saw orthopedist Dr. Brandon Fites, who opined that her symptoms did not suggest a problem with her right shoulder, but that she possibly had a

problem with the cervical spine.  Tr. at 398–99.  He ordered a cervical spine MRI.  Tr. at 399.

The MRI revealed that Plaintiff's right shoulder pain originated from disk herniation at disks C4-5 and C5-6, which caused central and foraminal stenosis. On July 23, 2008, Dr. P. Douglas deHoll performed a cervical diskectomy at C4-5 and C5-6 and an anterior cervical fusion at these levels. Tr. at 413–15. In the notes from her August 12, 2008 post-operative evaluation, Dr. deHoll noted that Plaintiff had no neck complaints, her right arm symptoms had improved, and that she had 5/5 strength and intact sensation bilaterally. Tr. at 394.  As of September 2008, Dr. deHoll reported that Plaintiff had no neck or arm complaints, but that she complained of low back pain.  Tr. at 392.  He noted that her neck was supple, she had no swollen lymph nodes, and she had 5/5 strength and intact sensation in both upper extremities.  Tr. at 392–93.  On examination, Dr. deHoll found Plaintiff's lower back to be tender and that she had a somewhat limited range of motion.  Tr. at 393.  She maintained normal strength and sensation in her back and lower extremities, and was able to heel- and toe-walk normally.  Tr. at 393.  X-rays of Plaintiff's back revealed "mild" degenerative changes at the L4-S1 vertebrae, and Dr. deHoll diagnosed Plaintiff with lumbar spondylosis (spinal arthritis).  Tr. at 393.

Plaintiff had knee surgery on October 31, 2008.  Tr. at 404.  Her knee problems predated her cancer diagnosis and treatment.  On January 31, 2006, prior to the alleged onset date of disability, Dr. John R. Fleming, Jr. noted that Plaintiff was having issues with osteoarthritis and that she had "aches and pain in multiple joints," especially "her

knees and hands." Tr. at 168. On June 5, 2006, Dr. Fleming noted that Plaintiff had recently injured her right knee and that she was seeing another physician (orthopedist Dr. David M. Woodbury) for that issue. Dr. Fleming also noted Plaintiff had "aches and pain in multiple joints." Tr. at 172.

Plaintiff testified that she had seen Dr. Woodbury about her knee injury just before she was diagnosed with breast cancer. Tr. at 39–40. She testified that Dr. Woodbury ordered an MRI, which showed she had torn ligaments in her knee on which he wanted to operate. Tr. at 40. Shortly thereafter, Plaintiff was diagnosed with breast cancer and put off the knee surgery so that she could focus on the cancer treatment. Tr. at 40.[1]

In October 2008, Plaintiff saw Dr. Woodbury with complaints of right knee pain. He diagnosed her with chondromalacia (degenerative damage to cartilage). Tr. at 401–03. At that visit, Plaintiff rated her knee pain as a three on a scale of one to ten. Tr. at 401. On October 31, 2008, Dr. Woodbury performed arthroscopic surgery on Plaintiff's right knee, which involved a right knee arthroscopy with lateral release, patellar chondroplasty, and chondroplasty of the medial femoral condyle. Tr. at 404. Operative findings by Dr. Woodberry included "Diffuse grade III chondromalacia patella, with extensive fissuring; there is a 5 mm circular area of grade III chondrosis on the anteromedial aspect of the medial femoral condyle; small 5 mm area of grade II and III chondrosis of the lateral tibial plateau." Tr. at 404.

_____

[1]The court has located no 2006 medical records from Dr. Woodbury in the record.

On December 15, 2008, Dr. Moses removed the Port-o-Cath from Plaintiff's neck. Tr. at 409. Plaintiff tolerated the procedure well. Tr. at 409.

    C.    The Hearing and Decision

        1.    Testimony

At the December 2008 administrative hearing, Plaintiff testified that she never became sick during chemotherapy, but that she experienced side effects including sinus infections and neuropathy in her hands and feet. Tr. at 28–32. She also testified that her breast cancer treatment caused her significant problems with swelling (lymphedema), tingling, numbness, and weakness in her left arm and hand. Tr. at 32–34. She wore a compression sleeve on her left arm that alleviated some of the swelling in her arm. Tr. at 29–31. Plaintiff testified that the neuropathy affected the use of her left arm and hand causing her to sometime drop things and that her left hand hurt "real bad." Tr. at 34. She further testified that the numbness she experiences in her feet from the chemotherapy limits the amount of time that she can stand or walk. Typically, she indicated that she could stand about 15 minutes before she experienced burning under her feet and would need to sit down and remove her shoes until she felt better. Tr. at 32–34. If she was unable to sit when needed, she indicated she felt as if she was going to fall down. Tr. at 32. She also indicated that the pain medication she took for the neuropathy and lymphedema made her "drowsy a whole lot" and that she took two-to-three naps per day for 30–40 minutes at a time. Tr. at 41–42.

When asked about any neck problems, she indicated she was not experiencing them at the time of the hearing. Tr. at 38. She indicated that she had experienced problems with her right knee just before being diagnosed with cancer in mid-2006 and that she did not have surgery on her knee until October 2008, after her cancer treatments. Tr. at 35, 39. She testified that her knee had been improving after the surgery, but that, at the time of the hearing, she needed a cane to walk. Tr. at 39.

Plaintiff testified that she was right-handed and that, although she dropped things with her left hand, she could do some things, such as wash dishes and drive. Tr. at 23–24, 34. She also indicated in paperwork provided to the agency that she became tired easily and could not complete tasks without stopping several times. She indicated that she did things in intervals, often with the assistance of her daughter. Tr. at 157, 142.

She testified that she was able to bathe and groom herself. Tr. at 42. She said that she was able to go to the grocery store, but that it hurt to drive and that she had to have assistance carrying her groceries. Tr. at 42–43. She said that she did some house-cleaning, but that her daughter helped her with the heavy cleaning. Tr. at 43. She indicated that she read, did crossword puzzles, visited with her neighbors, and attended church. Tr. at 48–49.

### 2. The ALJ's Decision

The ALJ applied the regulatory five step sequential analysis to determine if Plaintiff was disabled. 20 C.F.R. § 404.1520(a)(4). At the first step, the ALJ noted that Plaintiff had not engaged in substantial gainful activity since her onset date, July 20,

2006.  Tr. at 12.  The ALJ found at steps two and three that Plaintiff had severe impairments that did not meet or medically equal the requirements of any impairment in the Listing of Impairments, 20 C.F.R. pt., 404, subpt. 14 P, app. 1.  Tr. at 12–13.  Next, the ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform the full range of light work.   Tr. at 13.  At step four, the ALJ found that Plaintiff could not perform her past work.  Tr. at 15.  At the fifth step, the ALJ examined the Medical-Vocational Guidelines and found that Plaintiff could perform other work existing in significant numbers in the national economy.  Tr. at 15–16. Accordingly, the ALJ found that Plaintiff was not disabled under the Act.  Tr. at 16.

II.    Discussion

In her brief, Plaintiff argues that the Commissioner's findings are not supported by substantial evidence and are in error for the following reasons:

(1) the ALJ erred by failing to evaluate the specific time between July 2006 and January 2008 when Plaintiff was undergoing frequent cancer treatment and during which time frame her oncologist opined that she could not work;

(2) the ALJ erred by failing to find that Plaintiff's impairments of chronic pain, left upper extremity neuropathy and lymphedema were "severe" impairments;

(3) the ALJ erred in failing to valuate the chronic pain and in requiring physical evidence of the chronic pain and requiring evidence from emergency room or hospital treatment to prove the presence and severity of her chronic pain; and

(4) the ALJ erred in the determination that Plaintiff retained the RFC to perform a full range of light work activity.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ's decision is free from error.

A.   ALJ Findings

In his February 10, 2009, decision, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since July 20, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: degenerative disc disease, degenerative joint disease, obesity, and breast cancer (20 CFR 404.1521 *et seq.*, and 416.921 *et seq.*).

4.   The claimant does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.   After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on June 21, 1961, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports the finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, 416.969a).

11.   The claimant has not been under a disability as defined in the Social Security Act, from July 20, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 10–16.

B.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines "disability" as follows:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to past relevant work, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such

work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to past relevant work. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.   The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."   42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); s*ee Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at

390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

The ALJ found that Plaintiff had the severe impairments of degenerative disc disease, degenerative joint disease, obesity, and breast cancer.[2] He considered her impairments of hypertension and depression and found them to be non-severe. Tr. at 12. He then determined that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. Tr. at 13. He considered Plaintiff's RFC, found she could no longer perform her PRW, but found she could perform the full range of "light work" as defined by the Commission's regulations. Tr. at 13, 15. Based upon these findings, he consulted the Medical-Vocational Guidelines and determined that Plaintiff was not disabled. Tr. at 16.

Plaintiff argues that the ALJ erred by failing to address her inability to work during her 18 months of cancer treatment and by not finding her neuropathy of the left arm and

---

[2]An impairment is "severe" if it significantly limits a claimants physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a), § 416.921; *see Bowen v. Yuckert*, 482 U.S. at 140–42.

hand, the lymphedema of her left arm, and the chronic pain associated with these conditions to be severe impairments. Pl.'s Br. at 12 and Pl.'s Reply Br. at 1–6. Plaintiff makes the related argument that the ALJ erred by failing to consider her inability to work and these conditions in combination when evaluating her RFC.

The Commissioner counters that the ALJ appropriately considered all of Plaintiff's claimed impairments; that he considered Plaintiff's claimed neuropathy, lymphedema, and pain as part of the severe impairment of breast cancer; and that substantial medical evidence supports the ALJ's finding that Plaintiff is not disabled. Def.'s Br. at 8–9.

      1.    The ALJ Did Not Adequately Consider Plaintiff's Claimed Impairments.

The court first considers Plaintiff's allegation that the ALJ erred by not finding that she had the severe impairments of lymphedema and neuropathy. In addition to claiming her breast cancer was a severe impairment, Plaintiff also specifically listed lymphedema and neuropathy as separate severe impairments. *See* Tr. at 167 (Pl.'s Pre-hearing Brief including neuropathy and lymphedema as separate alleged severe impairments). Although the ALJ briefly mentions Plaintiff's having "some neuropathy secondary to her chemotherapy," (Tr. at 13) he does not more specifically address her neuropathy or make a finding regarding whether it is a severe impairment. Nowhere does the ALJ address Plaintiff's claimed lymphadenopathy other than to cite generally to December 2006 medical records that indicate Plaintiff showed "no lymphadenopathy" at that time. Tr. at 13.

The Commissioner argues that the ALJ adequately considered all of Plaintiff's

claimed impairments as evidenced by the finding that Plaintiff had the severe impairment of "breast cancer." The Commissioner argues that the ALJ's reference to Plaintiff's lumpectomy and post-operative chemotherapy and radiation treatment sufficiently demonstrated that he considered "all symptoms" of her breast cancer, including lymphedema and neuropathy. Def.'s Br. at 8. The court does not agree.

Unquestionably, the Commissioner may consider lymphedema and neuropathy that are secondary to cancer surgery and treatment to be their own, separate impairments. *See, e.g., Gibson v. Astrue*, C/A 0:08-2011-HMH, 2009 WL 3757686 (D.S.C. Nov. 9, 2009) (noting ALJ found plaintiff had severe impairment of lymphedema). However, the ALJ's passing reference to these conditions does not provide the court sufficient information to know whether he considered Plaintiff's numerous references to each of these conditions in her visits to her physicians during and after her cancer treatment. Without the ALJ's articulation of his treatment of the evidence, the court cannot determine whether the decision is supported by substantial evidence. Further, the post-hoc explanations the Commissioner offers in his brief do not salvage the decision.

Plaintiff points out that the ALJ's characterization of Plaintiff's surgery as a "lumpectomy" is incomplete and, potentially indicative of the ALJ's failing to fully consider Plaintiff's lymphedema whether it impacted her ability to work. In addition to performing a lumpectomy to remove the mass in Plaintiff's breast, Dr. Moses also removed axillary lymph nodes. Tr. at 235–36. The removal of the lymph nodes may result in a patient's developing lymphedema, which is "an accumulation of lymphatic

fluid in the interstitial tissue that causes swelling, most often in the arm(s) and/or leg(s), and occasionally in other parts of the body[,]" which may occur after removal of lymph nodes. Pl.'s Br. at 13–14 (*quoting* Stewart, PJ and De Los Santos, JF, National Lymphedema Network, LymphLink Question Corner July-September 2008, http://www.lymphnet.org/lymphedemaFAQs/; accessed January 30, 2010) and Nat'l Cancer Institute, Lymphedema Information Sheet, http://www.cancer.gov/cancertopics/pdq/supportivecare/lymphedema/Patient/page1/print, accessed 1/30/2010).

In his opinion, the ALJ did not reference that Plaintiff had her lymph nodes removed. This, coupled with his singular reference to the absence of lymphadenopathy in December 2006, makes it impossible for the court to determine whether he adequately considered Plaintiff's complaints of lymphedema. Without fuller discussion of Plaintiff's specific complaints regarding lymphedema, the undersigned cannot find that the ALJ's determination of nondisability is supported by substantial record evidence.

The ALJ's only reference to lymphedema is his citation to one of Dr. Clowney's December 2006 treatment records in which he indicated that Plaintiff "showed no lymphadenopathy" at that time. Tr. at 13. Review of the whole record, though, reveals other references that indicate Plaintiff's complaining of, and being treated for, lymphedema. For example, Dr. Clowney's notes of August 21, 2007 indicate that Plaintiff's lymphedema was "worse," and that he referred her to the Lymphedema Department of the Occupational Therapy at McLeod Hospital. Tr. at 340–41. Plaintiff

testified that she had gone to physical therapy for lymphedema from September through December of 2007. Tr. at 29. According to the discharge summary completed by Plaintiff's lymphedema therapist, Plaintiff's range of motion in her left shoulder was limited to 75% because of the pain of the lymphedema. Tr. at 322. Further, Plaintiff's subjective analysis of her pain at the time she was released from this therapy program was "a 20 plus some," on a scale of one to ten (with ten being "unbearable pain"). Tr. at 321.

The ALJ did not reference these complaints by Plaintiff, and the court cannot find that his decision is supported by substantial record evidence. Additionally, the ALJ's only reference to Plaintiff's "complaints of upper extremity pain" does not appear to relate to her complaints of lymphedema and neuropathy that affected her left arm and shoulder. Rather, the ALJ's reference to upper extremity pain concerned early 2008 complaints to her right shoulder. Tr. at 14. In discussing the early 2008 upper extremity pain, the ALJ notes, among other things, that examination indicated Plaintiff had "a normal range of motion." *Id.* It is unclear from which medical records the ALJ obtained this information, but notes that the "normal range of motion" comment is contrary to the evaluation of Plaintiff's Lymphedema Therapist. *See* Tr. at 321–22.

In that same paragraph discussing Plaintiff's normal range of motion, the ALJ references Plaintiff's July 2008 back surgery, which he indicates resolved her "neck problems." Tr. at 14. As noted by Plaintiff in her brief, this discussion appears to relate to Plaintiff's complaints of pain in her right arm that began in January 2008, which her cervical spine surgery resolved. Pl.'s Br. 17.

Because the ALJ does not appear to have considered all evidence of Plaintiff's complaints of pain in her left arm and shoulder, some of which had been attributed to lymphedema, the court recommends remand for full consideration of these issues.

The court also recommends remand for further consideration of Plaintiff's claimed impairment of neuropathy. The ALJ notes that Plaintiff had "some neuropathy secondary to chemotherapy," (Tr. at 13), but provides no further discussion of her complaints of neuropathy, nor does he make a finding regarding whether it is a severe impairment. In his reference to the neuropathy, he notes that she "underwent physical therapy." Tr. at 13. In her brief, Plaintiff points out that the therapy referenced by the ALJ was prescribed for treatment of lymphedema, not neuropathy. She also takes issue with any implication that the therapy in any manner "cured" Plaintiff's problems. Pl.'s Br. at 16. The Commissioner again argues that, regardless of the diagnoses discussed, the ALJ's findings are supported by substantial evidence indicating Plaintiff had no neurological or motor deficits. *See* Def.'s Br. at 8.

Based on the ALJ's brief discussion of Plaintiff's neuropathy, the court cannot determine that the ALJ properly considered all record evidence in reaching his determination of nondisability. At the hearing, Plaintiff testified that the complications of chemotherapy included neuropathy, which caused tingling and numbness in the bottom of her feet and in the left arm. Tr. at 28. In his December 11, 2006 progress note, Plaintiff's radiation oncologist Dr. Duffy indicates that Plaintiff "continues to have some complaints of left upper extremity discomfort," which he indicates is "likely related" to her prior

sentinel node dissection surgery. Tr. at 204. On December 18, 2006, Dr. Clowney notes Plaintiff's claims of left arm pain, numbness, burning, and tingling, which he opined is secondary to radiation changes and nerve damage. Tr. at 310–12. He informed Plaintiff that he expected the condition to improve "over time" and prescribed Metanx. Tr. at 310–12. On February 12, 2007, Dr. Clowney noted Plaintiff's neuropathy as "likely" being related to her Taxol chemotherapy treatment and continues her on Metanx. Tr. at 318–20. During her May 22, 2007 visit, Dr. Clowney's findings indicated Plaintiff's "paresthesia" (burning and tingling) in left arm. Tr. at 332. In his assessment, he indicated he continued to treat her neuropathy with Metanx and added another prescription, Celebrex. Tr. at 332–34. In February 2008, Dr. Clowney again noted Plaintiff's neurological complaint of paresthesia and assessed her with left arm pain and a limited range of motion in that arm. He continued her on Vicodin and Celebrex to manage the pain. Tr. at 350–52. In her visits to Dr. Clowney in April 2008, June 2008, and September 2008, he noted these same complaints and continued the same treatment. Tr. at 353–61, 389–91.

The ALJ's brief mention of Plaintiff's neuropathy and his noting that Dr. Clowney's physical findings were "normal" do not take into account other evidence of Plaintiff's neuropathy. Further, the ALJ's statement that she underwent physical therapy for the neuropathy (Tr. at 13) is not supported by the record. The court cannot determine that the ALJ's findings are supported by substantial evidence, and the undersigned

recommends remand for the ALJ's further consideration of all evidence related to the neuropathy.

Plaintiff also argues that the ALJ did not adequately consider her claims of pain, particularly pain related to the lymphedema and neuropathy in her left shoulder. Pl.'s Br. at 16–18. She argues that the ALJ focuses only on the pain associated with her right extremities, pain that began in early 2008 and for which she had cervical spine surgery. Pl.'s Br. at 16–18. The Commissioner counters that the ALJ appropriately considered her claims of pain in assessing her RFC. Def.'s Br. at 11–12.

The Commissioner properly notes that the ALJ should not have accepted Plaintiff's complaints of pain at face value, but that he should consider all of the evidence. However, as discussed above, the ALJ's decision does not make it clear that he considered all of the evidence regarding Plaintiff's claims of pain in her left arm and shoulder. Therefore, it is respectfully submitted that remand is appropriate.

On remand, the ALJ should determine whether these are severe impairments. The undersigned recommends this matter be remanded for full discussion of each of Plaintiff's claimed severe impairments, specifically including lymphedema, neuropathy, and the associated complaints of pain. On remand, the ALJ should determine whether Plaintiff's claimed impairments are "severe" and discuss the impact of each impairment on

Plaintiff's RFC.[3]  *See Aurand v. Astrue*, 07-3968-HMH, 2009 WL 364389 (Feb. 12, 2009)

(remanding, *inter alia*, ALJ had not discussed one of plaintiff's claimed impairments).

> 2. The ALJ Erred By Not Considering All of Plaintiff's Impairments in Combination in Determining Her RFC.

Plaintiff argues that, by not discussing her specific claims of lymphedema or

neuropathy in the decision, the ALJ did not appropriately consider all of her impairments

in combination in evaluating her RFC.  Pl.'s Br. at 18–21. The Commissioner argues

generally that the ALJ adequately considered all evidence and that his finding that

Plaintiff could perform the full range of light work is supported by substantial evidence.

The Commissioner does not specifically indicate how the ALJ properly considered all

impairments in combination.

The statutory and regulatory scheme for making disability determinations, as

interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all

severe and nonsevere impairments in determining a claimant's disability status.  *See*

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Rabon v. Astrue*, 4:08-3442-GRA,

2010 WL 923857 (D.S.C. Mar. 9, 2010) (requiring remand when ALJ did not consider

---

[3]Because the ALJ did not adequately evaluate Plaintiff's claimed impairments of lymphedema or neuropathy in considering whether impairments were severe or in discussing Plaintiff's RFC, the court need not specifically address the Commissioner's argument that it is only necessary for the Commissioner to consider one impairment severe to adequately satisfy step 2.  *See* Def.'s Br. at 10.  However, the court notes that at least one decision from this District has required remand for the ALJ to consider an impairment in its step-two analysis.  *See Bourgeois v. Astrue*, 6:08-2608-SB, 2009 WL 2351743 (D.S.C. July 29, 2009) (remanding to require ALJ to consider diagnosis not discussed at step two and to consider all severe and nonsevere impairments in combination).

severe and non-severe impairments in combination).  Even if the claimant's impairment or impairments in and of themselves are not "listed impairments," the Commissioner must also "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The Commissioner's duty to consider the combined effect of Plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability process." 20 C.F.R. § 404.1523.  Here, the ALJ failed to consider—or, at least failed to articulate whether and how he considered—all of Plaintiff's impairments together, thereby violating 20 C.F.R. § 404.1523, which provides as follows:

> Multiple Impairments.  In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

*Id.; see also Fleming v. Barnhart*, 284 F. Supp. 2d 256, 270 (D. Md. 2003) ("The ALJ is required to assess the combined effect of a claimant's impairments throughout the five-step analytical process.")

The court agrees with Plaintiff that the ALJ did not properly undertake this analysis. The ALJ's preliminary discussion of the step-by-step analysis he is to undertake correctly indicates that he is to determine whether a claimant has an impairment or combination of impairments that is "severe" and that he is to consider "all of the claimant's impairments, including impairments that are not severe" in determining a claimant's RFC. Tr. at 11–12 (setting out his responsibilities under steps two and four). However, as discussed above, by not discussing Plaintiff's claimed lymphedema at all and not fully discussing evidence regarding her neuropathy, it is impossible to tell whether the ALJ considered all of the claimant's impairments separately or in combination at any step of his analysis. Neither this statement of the standard, nor his generic finding that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526), 416.925 and 416.926)" (Tr. at 13), is legally sufficient. *See Walker*, 889 F.2d at 50 (holding a general finding that a claimant "does not have an impairment or combination of impairments that meets a listing "is not sufficient to foreclose disability").

Therefore, the undersigned recommends that, on remand, the ALJ examine the combined effect of Plaintiff's severe and nonsevere impairments on her ability to work.

3. The ALJ Did Not Appropriately Consider Plaintiff's Ability to Work While Undergoing Cancer Treatment.

a. Dr. Clowney's Statement

Plaintiff complains that the ALJ did not discuss her ability to work during her 18 months of cancer treatment. Pl.'s Br. at 12. Plaintiff's oncologist stated that Plaintiff would be out of work for the 18 months she was under his care for cancer treatments. *See* Tr. at 268 (noting Dr. Clowney's January 2007 statement that he had been treating Plaintiff "since August 2006 and she will be out of work for an additional 12 months due to her treatment regimen."). The Commissioner acknowledges that the ALJ did not reference Dr. Clowney's opinion. Def.'s Br. at 9. Rather, the Commissioner argues that the following statement by the ALJ indicated he sufficiently considered Dr. Clowney's opinion:

> As for the opinion evidence, no physician treating the claimant has suggested specific functional limitations for her. Since the alleged onset date, the objective findings and treatment notes of claimant's treating physicians are consistent with the residual functional capacity limitations described above, and are the credible findings as to her subjective symptoms.

Tr. at 15.

The court cannot agree with the Commissioner. This seemingly boilerplate paragraph does not inform the court regarding what "opinion evidence" the ALJ considered. More specifically, the ALJ's statement does not provide the court with information regarding what opinion evidence the ALJ considered and whether he considered Dr. Clowney's opinion at all. *See Cook v. Heckler*, 783 F.2d 1168, 1172 (4th

Cir. 1986) (noting ALJ must provide sufficient information regarding decision for reviewing court to determine whether decision based on substantial evidence); *Gravely v. Astrue,* C/A No. 8:06-2352-MBS, 2008 WL 471647 (D.S.C. Feb. 18, 2008) (remanding for additional ALJ analysis because unclear what ALJ considered in determining plaintiff's RFC).

In fact, the ALJ's only reference to specific expert evidence is his noting that he "considered the opinions of the State agency consultants." Tr. at 15. His discussion of their opinions, though, is non-substantive. Rather, he indicates that their opinions are not entitled to significant weight because they were rendered prior to the receipt of "new evidence . . . including hearing testimony" that "reveals material facts regarding the claimant's medical condition." Tr. at 15. The ALJ does not indicate what those new, material facts are, nor does he discuss how they bear on the consultants' opinions regarding Plaintiff's RFC and whether she is disabled.

The undersigned recommends remand for further consideration of this and all opinion evidence because the court cannot adequately review a decision when it cannot determine the ALJ's reasons for its findings. In making this recommendation, the court notes that the only record references to Dr. Clowney's opinion regarding Plaintiff's limitations of which it is aware are found in a medical consultant's report and in an agency evaluation. Tr. at 64, 268. These references do not provide details regarding the bases for Dr. Clowney's opinion. The court is mindful that a medical sources's statements that a patient "is disabled" or "cannot work" are afforded no special significance, and the

undersigned does not suggest that such statements, standing alone, be given special significance in this matter. Nonetheless, based on the record as a whole, including Dr. Clowney's treatment records in conjunction with his opinion, the undersigned recommends that, on remand, the ALJ fully consider this evidence, and, as appropriate, obtain additional information regarding Dr. Clowney's opinion. *See Rhodes v. Astrue,* C.A. No. 4:08-1080-PMD, 2009 WL 3166538 (D.S.C. Sept. 29, 2009) (remanding with instruction that ALJ request additional information from treating source regarding opinion).

### b.   Plaintiff's Work Absences

Plaintiff also argues that the ALJ should have considered the time she spent on her cancer treatments as a vocational limitation on the work she could perform. As detailed by Plaintiff in her reply brief, her 18 months of treatment required her to be out of work about one half of the work day each time she had treatments and related appointments, and she had between four and 8 appointments each month while receiving treatment. Pl.'s Reply Br. at 1–6. Plaintiff argues that the ALJ should have specifically considered this and had VE testimony regarding what impact, if any, that would have on her ability to work (at least during that 18-month period). *Id.* at 6.

In support of that argument, Plaintiff cites *Smith v. Astrue*, C/A No. 3:0-67, 2008 WL 1913579 (N.D.W. Va. Apr. 25, 2008). In that case, the court held that the ALJ erred by not questioning a vocational expert ("VE") about whether plaintiff's possibly missing work because of headache pain was error. *Id.* at *16 ("the ALJ's failure to include in the

RFC or the hypothetical [to the VE] Claimant's need to miss work—even for one day—due to headaches is not supported by substantial evidence). The court is aware of no opinion in this District that suggests a contrary result. *See Jackson v. Astrue*, C.A. No. 0:08-894-TLW, 2009 WL 2513525, *8 (D.S.C. Aug. 11, 2009) (remanding for full consideration of all evidence of plaintiff frequent work absences and impact on her ability to work); *see also Lovette v. Astrue*, No. 07-2029, 2008 WL 62507, *5 (W.D. Ark. Jan. 4, 2008) (remanding for consideration of impact excessive work absences during treatment).

Here, the ALJ noted that Plaintiff underwent chemotherapy and radiation after her July 2006 surgery through January 2008, but he does not specifically address whether he considered the time Plaintiff would have to miss from work during the 18-month period in determining her disability status. The court recommends remand for the ALJ's consideration of what impact the time away from work would have on Plaintiff's ability to work and whether VE testimony would be appropriate in that analysis. Further, the undersigned recommends that, on remand, the ALJ consider whether a closed period of disability may be appropriate. *See Lovette*, 2008 WL 62507, *3, 5–6 (remanding with instruction for ALJ to consider potential closed period of disability during 17 months of cancer treatment).

III.    Conclusion and Recommendation

Based on the above, the undersigned recommends that the Commissioner's decision be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action as set out herein.

IT IS SO RECOMMENDED.

November 9, 2010                          Shiva V. Hodges
Florence, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**